Good morning. May it please the Court. Lucas Castor on behalf of the Appellant David Meza. The District Court's opinion in this case should be reversed and remanded for two reasons. First, contrary to the District Court's finding, the factual and legal record in this case contains admission after admission after admission that Union Pacific imposed work restrictions and refused to allow Mr. Meza to return to work because it believed he had significant neurological injuries. In fact, one need only look so far as the introduction to Union Pacific's motion for summary judgment at Appendix 18, where it plainly admits that it imposed the restrictions because it believed Mr. Meza had significant neurological injuries that posed a risk for future seizures. According to this Court's recent decision in Sanders v. Union Pacific, a case involving a mirroring factual scenario, no other evidence is necessary and a jury question exists whether Union Pacific regarded Mr. Meza as disabled under the ADA. And second, this Court has previously held that it usually does not address a jury question. That's correct, Your Honor. This Court has previously held that it usually does not address issues that were not first considered by the District Court. That's the Cavan v. Twin City pipe case at 223 F. 3rd, 827. Here, the District Court only decided the first element of plaintiff's claim or the regarded as issue. Importantly, that decision by the District Court predated this Court's decision in Sanders. There's been a lot of talk about the age of cases this morning. Sanders is a case from this Court, a unanimous panel written by the Chief Judge Colleton from July of last year. I think that may take the day in terms of the recent age of a case. And in that case, the similarities between the factual circumstances in Sanders in this case are quite striking. In both, obviously, they dealt with the same defendant. Both plaintiffs were alleged to be performing the same type of duties or the carman duties. They both were deemed fully recovered by their treating providers and released to return to work with no restrictions. Sanders, it wasn't, you didn't have the expert, though, saying that it would be two years. Two years' time would have been okay, right? Well, and that's a distinction. That's not what, in terms of his actual expert opinion, what Dr. Trangle says in this case. What he says is even if you adopt Union Pacific's reasoning and the adoption of the FMCSA handbook, then at most it would be two years. What he says in his actual opinion is he should be released at the time that his treating providers And you have nothing like in Sanders where they refuse to let him take a test, right? You're aware of the fact in Sanders. Yes, I am. Yes, where there's the knee test and taking the physical ability test. Versus water or something. Correct. But the rationale and the decision makers in both cases are also the same. Here, they're Dr. Charbonneau and Dr. Holland. In Sanders, it was just Dr. Charbonneau. And your experts are the same. And our experts are the same. Proceed. And defendant's experts are from the same university hospital. And defense counsel is the same. Mr. Moore and Mr. Kenneson represent a defendant in both these cases. And so considering the factual similarities of the two cases, Sanders is really dispositive on this issue addressed by the district court and makes clear that there's a fact issue in this case. What about, you know, I just want to ask pretext. It seems like the evidence of pretext here is extraordinarily weak. And we can affirm on any grounds supported by the record, particularly when you're talking about one test, the McDonnell-Douglas burden shifting test. So why shouldn't we just say, you know, say the district court may have been wrong on what it decided, but there's another basis for affirming here? Because I don't think you even need to get to the pretext question. Because according to Sanders, this is a direct evidence case. Because Union Pacific plainly admits that it's taking the action, imposing the work restrictions, and refusing to allow Mr. Mays' return to return because of his. Well, let's say we disagree with that. Well, I think the factual record demonstrates that they do. And, in fact, there's a number of references in the record, an appendix. Are you going to answer the question? Sure. What if we disagree with you? If we don't think it's a direct evidence case, at least on this record so far? Well, I think the record. What about Judge Strass' point? Sure. The record still demonstrates that there's sufficient evidence to raise a jury question about whether the alleged impairment, either actual or perceived, impacted the decision. And they took it because of that. And that goes back whether you rely on the same evidence to say that it's direct evidence or indirect evidence. It still creates a fact question. Yeah, but the problem is the legitimate nondiscriminatory reason is pretty strong, safety. I mean, that's a pretty strong. And then you've got, I think maybe you can highlight the pretext. But one of them is, well, a later doctor said maybe we should have done a case-by-case instead of doing a flat five-year ban. And you might have some other pretext evidence as well. But the evidence of pretext, again, assuming it applies, is pretty weak here. What else do you have other than the fact that the change in the physician would have recommended post hoc something different? Well, there's also the evidence suggesting that Mr. Mazza had worked without issue for 20-plus years. And his managers testified during their depositions that he had all of the skills and abilities to perform the job. And nobody at Union Pacific voiced any substantial concern about his performance. And immediately after he discloses this issue, their view of his performance and view of him drastically changes such that they issue these broad-ranging restrictions, preventing him from doing any type of action that he would be required to perform for his job. Did that make them change? Or did they say, oh, my gosh, this is a dangerous job. If he's got this disability, we could have a safety problem. Sure. But we're also talking about where safety should be applied in this standard of cases. Under Sanders, safety clearly applies under the direct threat analysis, not in any of the other elements of plaintiff's prima facie case. And that is because the ADA specifically says that if the employer is saying that the individual is unsafe because of some condition, that is addressed under the direct threat standard. And Union Pacific made the same argument in Sanders. They made the safety arguments in really all of the elements of the case in an attempt to shift that burden to the plaintiff. And in Sanders, Chief Judge Colleton essentially disregarded those arguments and said the question is really did Union Pacific make the decision or is there a jury question whether Union Pacific made the decision because of that alleged, actual, or perceived impairment. And in there he said he did, but he actually used stronger language. Before you go there, couldn't you say, though, I mean, you're trying to make it a direct threat, but I could see where it enters into McDonnell Douglas. And I know you disagree that it applies at all. But you could say did they make the decision because of a safety issue, which is their legitimate nondiscriminatory reason, or did they make it because they just don't like disabled people?  And it really comes back to, and I'll point to Judge Loken's Mold decision, which was referenced by a defendant in their case. The question is whether the evidence is sufficient to raise a jury question, that it was because of the actual impairment or perceived disability or actually a disability that the employer took the action. In that case, in Mold, the plaintiff had longstanding performance issues, both before the diagnosis and disclosure to the company and after. And what Judge Loken wrote is there wasn't evidence in that case demonstrating that the employer took the action of terminating the employer because of the underlying MS diagnosis, because the performance issues predated that diagnosis and disclosure and continued thereafter. And there wasn't evidence in the record saying it was because of. Here, we have clear admissions throughout the record that Union Pacific imposed the restrictions and alleged that Mr. Maisel was not safe because of this issue about intraparenchymal hemorrhages and his traumatic range injuries. It was that reason that they said Mr. Maisel was not safe, and that creates the jury question in this case. It's not just they're saying, well, you're unsafe for some unspecified reason. Or in Judge Loken's case, the person can't perform the job generally without any reference to the physical condition of the plaintiff. Here, they are plainly admitting that it is Mr. Maisel's physical condition, his neurological injuries or alleged neurological injuries, that were the actual reason why they believed he was unsafe and imposed the restrictions. And that's why it would be a direct evidence case. But if not, that same evidence raises a jury question on the causation question. I see that I'm getting close to the end of my initial time, so if there are no other questions, I'll reserve the remainder of my time for rebuttal. Five minutes? Correct. Your call. Thank you. Good morning, and may it please the Court. Mr. Keneson. Yes. My name is David Keneson. I'm here today on behalf of Union Pacific, and we are asking the Court to affirm the district court's finding that Union Pacific did not violate the ADA. I think the record in this case exemplifies everything that Congress intended when it passed the ADA and declared that individuals should be assessed on the relevant medical evidence. And to that end, there are two dispositive, undisputed facts, both of which come from plaintiff's own doctors and show that Union Pacific acted reasonably and lawfully. The first is Dr. Trengel said that at the time of Union Pacific's decision, it was not safe for Mr. Meza to be working as a car inspector. Dr. Trengel said it was reasonable to submit him for a fitness for duty and that a two-year restrictive period arising from that fitness for duty was, quote, reasonable, appropriate, and applicable. Proposing counsel says, though, that that was assuming that Union Pacific's assessment of him was correct and that the doctor disagreed with that underlying assessment. I don't think that's correct, Your Honor. If you look at his two expert reports and its bold, highlighted language in those expert reports, he very clearly says this should have been two years. Now, he contradicts himself in his deposition and says something altogether different, but admits, yeah, I never wrote that in my written expert report, and it's our position that the expert's opinions in the Rule 26 reports ought to govern. The second dispositive and undisputed fact here comes from Dr. Zorovand, plaintiff's own treating neurologist, who testified that Mr. Meza faces a lifetime risk of seizures. So this — so the possibility of a sudden incapacitation event was never imagined. It was very much real, and it was undisputed. Now Mr. Meza asked the Court to ignore his own expert's opinions and find discrimination where none exists. The district court, the basis of its holding was that Mr. Meza was not regarded as disabled, and the district court correctly drew a distinction between acting on a current impairment and the risk of a future impairment. And the ADA simply does not reach the risk of a future impairment. And Union Pacific — You better address the Sanders case. Either way. Yeah. The Sanders case, what the Sanders case said was that individual had a heart impairment, and Union Pacific was concerned that with that heart impairment, the individual could not go out into the field and perform the essential functions of the job because it interfered with those essential functions. Union Pacific here said Mr. Meza could go out today, as of the date of the decision, and do his job. He was fully capable of that. The problem was the medical risk, the statistical risk of a seizure that it was concerned about. And that's the distinction between a current neurological impairment and the risk of a future impairment. I've got to say I don't buy that because it would be true if the impairment that he actually suffered didn't qualify as a disability, but the traumatic brain injury is itself a condition. It would be like saying so-and-so has diabetes, and we're really worried about the risk that their blood sugar may get low, and so that's why we're doing it. Well, that's connected to the underlying condition, diabetes, just like it's connected to the underlying condition here. Sure. Absolutely, a connection exists, and it would be disingenuous to argue otherwise, except the difference is Union Pacific allowed Mr. Meza to return to work. In other words, he had the scar tissue, he had the brain damage. That was permanent. But as this Court said in the Fisher case, Fisher v. Minneapolis Public Schools, allowing an employee to return to work undercuts a regarded-as argument, and that makes sense here. Union Pacific brought him back after five years because it was acting on a future risk of seizures that ultimately never materialized, even though when he returned, he still had the brain tissue and the scarring damage. So isn't the better argument here pretext? I mean, it's more straightforward than kind of going out on a limb like the district court did on this. I do think there is absolutely, to your point, the evidence of pretext isn't just thin. It's nonexistent. Meza's position here on pretext is, well, you made the wrong medical decision. I'm going to disagree with the medical decision on the merits. That is not pretext. Everybody agrees here that safety was the legitimate, nondiscriminatory reason. Heck, his own expert, Dr. Trangel, says, yeah, you should have taken him out for two years. But a difference of medical opinion between two years and five years is absolutely not pretext, and so they cannot satisfy that. But I'd go back to the second element of McDonough. Well, actually, under any ADA claim, the plaintiff has to show that they are qualified. There is no possible way that Mr. Meza can show he is qualified in this case because of two principles from this Court. First, an employee is not qualified if their own medical expert restricts them from performing essential job duties. And two, whether an employee is qualified is measured only at the time of the adverse decision, even if they're going to get better into the future. So the fact that Dr. Trangel says a two-year restrictive period here was reasonable, appropriate, and applicable means that at the time of the February 2017 decision by Dr. Charbonneau, he was not qualified. So you don't even need to get to pretext because he can't show qualified. And that applies whether this is a direct evidence case, an indirect evidence case, it doesn't matter. He's not qualified at the time of the decision, and that is the dispositive issue. Since you mentioned it, you mentioned the direct evidence. Opposing counsel argues this is a direct evidence case. I don't necessarily see that, but I wanted to give you a chance to respond. Sure. Sure. This is not a direct evidence case. Direct evidence shows evidence that is discriminatory without any inference whatsoever. Just because the employer considers safety does not make it a direct evidence case. Of course there is a connection between the health condition and safety, but the ADA is not like race or gender. And the ADA recognizes that because it specifically allows employers to submit employees to fitness for duty exams under Section 12112D when there is a reasonable concern that the health condition might interfere with the essential job duties. In other words, the ADA tells employers, go ahead and consider that. It cannot be direct evidence if restrictions that are based on objective medical evidence by a qualified doctor arise out of a statutorily authorized procedure, the fitness for duty exam. It would be the same thing, Judge Strauss, as you recognize in your dissent in the Huber v. Westar case where you said that the employers have to make reasonable decisions, but it's not the court's job to second guess those decisions. And that aligns exactly with the Moll decision where the court said that firing the employee because of the job performance consequences of the disability rather than the disability itself is not actionable under the ADA. So you may have, for instance, a policy violation. An employee is — violates the attendance policy. Every attendance violation may be caused by their disability. That does not preclude the employer from addressing the policy violation, lest it be direct evidence. And the same is true in safety, especially when the ADA authorizes fitness for duty exams. The employer can address the safety consequence without discriminating on the basis of the disability. So we believe that the — Do the judgments belong under direct threat defense? I don't think so, Your Honor. That's what Sanders sort of says, doesn't it? I don't think Sanders says that, no. So Sanders was obviously a jury trial director. After a jury trial. It was after a jury trial. It was not on summary judgment. And the Court said — or the Court found that causation was established. But it's very important in that case. Dr. Trengel, the same testifying medical expert in this case, called the medical decision in Sanders completely uncalled for and not based on any medical principles at all. In other words, there was evidence that the jury could have considered to find that the medical decision was so wrong, was so erroneous, that it rose to the level of discriminatory, that it was based on a disability and nothing else. Whereas here, you have Dr. Trengel saying you should have taken him out for two years. And his own neurologist, Dr. Zorovan, says there is a lifetime risk of seizures. In other words, there's no dispute that the decision was based on this safety risk. It's just a question of should he have been out for two years or five years. But it doesn't matter because at the time of the decision, because of Trengel's view that two years was appropriate, he's not qualified. So we don't even need to get to — How can you say it's only a future risk when it could have happened that day? Sure. At the time of Dr. Charbonneau's decision in February 2017, he's looking forward and saying five years from the date of the accident, we cannot have you out there performing safety-sensitive duties. So it's a forward-looking analysis from Dr. Charbonneau's perspective at the time of the medical decision. But it's a current risk. Well, sure. It's a current risk, but he's projecting into the future. It's a lifetime current risk. It's a lifetime risk from his own expert's view. Dr. Charbonneau was actually more conservative than that, saying at five years, that is the unacceptable — that's sort of the delineation of when that risk became acceptable, and that's when they put him back to work. Do you agree completely with Judge Schrasser's dissent in Westar? I think he analyzed the causation piece very well in that particular case, and I know that — So do you agree completely with his dissent? I believe — yes, I believe that I do. Even if, though, this Court were to find that this is a direct evidence case, and again, we don't believe that it is, but even if the Court were to find that, we think the Court's analysis from the Norcross decision back in 1985 would be applicable. And what Norcross said is that there are cases where employers may acknowledge relying on a disability. Now, again, we don't concede that. We think it was a safety-related consequence of the health condition. But nonetheless, under Norcross, the key question is, did the employer have a reasonable basis to find the plaintiff is not qualified and whether the employer improperly accounted for the disability in light of the job duty? So again, under that analysis, Union Pacific still prevails because the job is unquestionably dangerous. You have Triangle saying, yes, some restrictive period, two years, was appropriate, and you have Dr. Zorovan saying, this individual faces a lifetime risk of seizure. So the fact that Union Pacific held him out for five years, it cannot be said that there was an improper consideration of the health condition. Is the key fact here, and I'm just wondering, the fact that his own expert, and that's what delineates it from Sanders, suppose we had a situation in which his experts said categorically, this is such a slight risk. It's a one in a million type of thing. Never going to happen. Could happen, but probably won't. And so taking this guy off the job is crazy. Then do we have a jury issue, and does the case go forward? No, I don't think you do. And in that scenario, in that hypothetical, I would look at it from the direct threat perspective. And under that analysis, the question is, did the employer have a reasonable basis? Did the employer exercise reasonable medical judgment to make the decision that it did? Not whether other experts might disagree or other experts might be more or less risk-averse. That's not the question under direct threat. Under direct threat, the question is, did the employer consider the objective medical evidence, and did they make a reasonable medical decision? And we're going to evaluate, courts are going to evaluate that decision on its own terms, not is there medical consensus. Courts or juries? I'm sorry? Courts or juries? Courts can absolutely analyze that question. No, you said courts are going to analyze it on this. Did they make a reasonable judgment and reasonable decision? Courts can decide. When you say courts, do you mean juries? No, I do not. Are you talking about summary judgment or jury question? Yes, summary judgment. The district court can, and appellate courts can, find that the medical decision, in fact, Carrillo, we say- Only if no reasonable jury couldn't. Because the question is, is the medical decision on its own terms reasonable based upon the process that the employer followed? Somehow juries aren't competent to decide that. It has to be done by judges. No, that's not what we're- That's not what you're saying. I mean, you're ignoring the stage of the case. Your Honor, I would push back on that. Both sides are, frankly. I would point the Court to the Carrillo decision that we cited in supplemental briefing. That's from the Fifth Circuit just a couple of weeks ago. That was a direct threat case. And what the Fifth Circuit said is, that was an individual who passed out. There was a question about what caused this individual to pass out. Union Pacific applied five-year restrictions. And what the Fifth Circuit said was, Union Pacific's medical decision, at summary judgment, by the way, was objectively reasonable. It was based upon the FMCSA. And they satisfied, Union Pacific satisfied its burden on the direct threat defense. So it is not, in every case, a jury question to decide whether the medical decision was reasonable or not just because an expert comes in from the plaintiff and disagrees. That could happen in almost every case. The real question is, on its own merits, was the employer's decision objective and was it individualized and was it objectively reasonable? And that question can and has been decided as a matter of law, as I said just as recently as Carrillo, on very, very similar facts. Real quickly, I want to touch on the releases from Mays' doctors. He points to these releases from five physicians. Four of them didn't even know about the brain bleed or they weren't considering the future risk of seizures. Two of them, one was a chiropractor and one was a physical therapist. The only doctor who knew about the brain bleed was Dr. Zorovan, who testified he has a lifetime risk of seizures. And when she released Mr. Mays to work, she was saying up to this point he hadn't had a seizure, but I'm not looking forward into the future to assess his future risk of seizures. I see that I'm out of time. And with that, I thank the Court. Thank you. Fair rebuttal. Thank you, Your Honor. I want to first address this issue of pretext. I want to go back to the Sanders decision. At page 1066, Sanders never mentions McDonnell Douglas, for example, right? Correct. Does it even have the word pretext in the opinion, counsel? It does not. Yeah, that's what I thought. And so at 1062, the Court writes, Sanders satisfied the third element in this case because the defendant acknowledges relying on the plaintiff's impairment in reaching the employment decision. Well, I want to ask you about that. So I think your view is that if it has anything to do with the disability, the case goes forward. I'm going to just give you an example. Suppose somebody suddenly was blind and the guy is a truck driver. Clearly, the restrictions being placed on them is because he's blind, right? You cannot have a blind truck driver. Would that case go forward or is it enough to say, well, the legitimate non-discriminatory reason is we can't have a truck driver with a 15,000-pound truck running into other cars on the highway. That's crazy. And if that case is different, why is it different from this case? Well, Your Honor, the issue you're talking about is whether the plaintiff still is qualified. It's not a causation question. It's a qualification. Can they meet the essential functions of the job? It's also a legitimate non-discriminatory reason and pretext question, potentially, as well. But the non-discriminatory reason, as we state in our brief, has to be untied to the protective characteristics. That's exactly why I'm asking the question. Right. You're identifying why I'm asking. And that would be crazy if we had modified the law to be what you are, which is to say that a case potentially goes forward because we should, because it's because of the disability that he's being pulled back. No, because the person is not qualified. He can't meet those essential functions. You don't get to the non-discriminatory rationale. You have to meet the other elements. Just because you meet one element doesn't mean you meet the rest of the elements. But does it show it's pretext, pretextual in the sense that it's disability animus to allow a, or, you know, to take a blind truck driver off the road? I think all of this blends together a little bit more than you would expect. But you still have to meet the qualifications. Oh, I agree with that. Right. And so here there's no issue about qualifications. Well, opposing counsel disagrees. Okay. Well, all of opposing counsel's arguments are best addressed under the direct threat analysis. And what I want to take the Court to is Appendix 3240 through 43, and specifically at Appendix 3240. This is Dr. Charbonneau's email from February 15th of 2017, the first initial fitness for duty determination. And he writes in that email and in his memo, due to the nature and severity of his traumatic brain injury with intraparenchymal hemorrhage contusions, the employee will require sudden incapacitation restrictions for a minimum of five years. He's saying it is because of the alleged impairment, it is the physical condition that is the sole reason why the restrictions are necessary. Under Sanders, that is direct evidence. And according to that, the Sanders decision, that satisfies the causation element. Whether you look at it under the direct evidence standard or an indirect standard, it satisfies that standard. I want to address a couple other things. Appendix 2, with respect to Dr. Trangle, that is simply not what he says with respect to his expert opinion. I'd direct the Court to Appendix 1854 through 55 and Appendix 1852 through 56, where Dr. Trangle specifically testifies in his depot that Mr. Meza is safe to return to work in February or March of 2017. Why is there a genuine issue, though, about qualifications? Actually, your response to me raised another question, which is your opposing counsel disagrees with your characterization. If he was not eligible for two years, your own expert says that, how could he have been qualified to immediately get back on the job? You said there's no issue about that, but maybe there's no issue in favor of the employer. So, but you have to understand what Dr. Trangle is talking about. He's talking about the risk issue, which is only properly analyzed under direct threat, not qualification. The question — Didn't you just say the opposite to me, which is that that's all about qualification? No, I think I was referring to your Honor's example about whether a blind person can drive a truck. That's a qualification issue. But Dr. Trangle's opinion is about risk and safety. That issue is only properly addressed under direct threat. How is that any different? I don't understand what you're saying. How is that any different from the truck driver example? If you had two medical opinions, one said that you've got two years, you can't drive a truck. One said that you have five years. What's — I mean, because the person is blind, their sight may come back. You're talking about the ability to perform an essential function there, driving. That's the essential function. Here, there is no essential function that defendant identifies that Mr. Mazur can't perform. In fact, everyone testified he could perform the job. The only issue they're talking about is safety. That's the distinction. And safety is addressed under direct threat. I have ten seconds. I just want to address the Dr. Zorovan case. Under our line in Bragdon, the Court specifically said, because few, if any, activities in life are risk-free, our line and the ADA do not ask whether a risk exists, but whether it is significant. Dr. Zorovan said nothing about that risk being significant above the general population. So that's a distinction. With that, I ask that the Court reverse and remand. Thank you, Your Honor. Thank you.